**BROTHERHOOD OF LOCOMOTIVE FIRE-
MEN AND ENGINEMEN et al. v. INTER-
STATE COMMERCE COMMISSION.**

No. 8728.

United States Court of Appeals
District of Columbia.

Argued Nov. 15, 1944.

Decided Jan. 15, 1945.

Mr. Willard H. McEwen, of Toledo, Ohio, with whom Messrs. Frank L. Mulholland, of Toledo, Ohio, and Edward C. Kriz, of Washington, D. C., were on the brief, for appellants.

Mr. Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and EDGERTON and ARNOLD, Associate Justices.

GRONER, C. J.

The single question in the case is whether the Interstate Commerce Commission, under the provisions of the Railway Labor Act, has jurisdiction and power to deter-

mine a question of employment relationship in the circumstances we are about to detail. Both the Commission and the District Court answered in the negative.* The question arose in these circumstances:

Appellants are the bargaining representatives of the employees of the Nevada-Northern Railroad, a rail carrier operating between two points known as Ruth and Cobre in the State of Nevada. The railroad is a wholly owned subsidiary of Kennecott Copper Corporation. The latter corporation owns an ore mine at Ruth and an ore treatment plant at McGill. The operation of the mine and plant is carried on by Consolidated Copper Corporation, another wholly owned subsidiary of Kennecott. The controversy concerns the engineers and trainmen who operate ore trains the short distance between these points. The complaint shows that prior to 1920 this operation was performed by the Railroad under its published tariffs. In that year, however, Congress provided for "re-capture" of excess earnings of prosperous carriers, to avoid which, it is charged, the Railroad and the Consolidated Copper Company entered into an agreement, by which the Railroad sold the necessary cars and equipment to the Copper Company, entered into a trackage agreement with the latter for the use of its tracks between the points in question, and transferred from the payroll of the Railroad to the Copper Company the engineers, firemen, etc., employed in the operation of the trains. This arrangement for the movement of the ore from the one point to the other continued from that date and is still in force and effect. The objective of the trainmen in this proceeding results from their very natural desire to obtain the benefits accruing to employees *in the service of a carrier* under the provisions of the Railway Labor Act, as amended in 1934, 45 U.S.C.A. § 151 et seq.

The respective contentions are these: The appellant unions say that the employees engaged in the ore-carrying service are, notwithstanding the arrangement spoken of above, actually in the service of the Railroad because they perform the same kind of work performed by railroad trainmen, engineers, etc., as defined in orders of the Interstate Commerce Commission, and hence are entitled to the benefits of the Labor Act.

The Copper Company contends that the men are its employees and are not employees of the Railroad. At the hearing before the Commission appellants submitted no evidence, but the Copper Company and Railroad filed exhibits of their separate corporate organizations and a copy of the trackage agreement, giving the Copper Company for an indefinite term a "non-exclusive revocable license" to operate its trains over the tracks of the Railroad between Ruth and McGill. It also filed exhibits showing the location of the properties and method of operation, and exhibits dealing with the employment and compensation of the men engaged in handling the trains, and offered to prove that the ore train operators were bona fide employees of the Copper Company in an inter-plant service under a lawful arrangement with the Railroad. As shown above, there is complete affiliation between the several companies.

The basis of appellants' insistence that the Interstate Commerce Commission has jurisdiction to act on the petition is Section 1, Fifth of the Railway Labor Act, as follows:

"The term 'employee' as used herein includes every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission now in effect, and as the same may be amended or interpreted by orders hereafter entered by the Commission pursuant to the authority which is hereby conferred upon it to enter orders amending or interpreting such existing orders: *Provided, however,* That no occupational classification made by order of the Interstate Commerce Commission shall be construed to define the crafts according to which railway employees may be organized by their voluntary action, nor shall the jurisdiction or powers of such employee

---

* The Brotherhood filed a petition with the Commission requesting that it amend or interpret its orders so as to include the work of the particular ore haul employees represented by the Brotherhood. The Commission dismissed the petition on finding that it was without jurisdiction. Appellants then filed a complaint with the District Court asking for a declaration of their "rights in the premises" (i. e. that the Commission has jurisdiction under the Railway Labor Act to decide the question), and for an injunction ordering the Commission so to do.

organizations be regarded as in any way limited or defined by the provisions of this Act or by the orders of the Commission." Section 1, Fifth, U.S.C.A., Title 45, Section 151, Fifth, 44 Stat. 577, as amended.

The Railway Labor Act was passed to provide for the prompt and orderly settlement of all disputes between carriers and employees concerning rates of pay, rules and working conditions. To administer the Act two agencies were created, one, the Mediation Board, and the other, the Railroad Adjustment Board. In contrast with the manifold duties placed upon these two Boards, the powers and duties assigned to the Commission under the Act are clearly limited to the field in which the Commission has peculiar expertness, and to transportation problems with which the Commission has long been engaged. Two paragraphs only relate to the powers of the Commission. In Section 1, *First,* express power is given the Commission to determine whether any line operated by electric power falls within those classes of carriers which are specifically excluded from the Act. The other, Section 1, *Fifth,* preserved the Commission's former classification of employees of railroads under the Transportation Act (which was repealed on the passage of the Railway Labor Act), continued this classification and, in addition, extended the power of the Commission to include the right to "amend and interpret such existing orders." Hence, unless there can be found in this provision, *by implication,* the power of determining the employer relationship, the Commission's decision that it is without power is clearly right. For even appellants themselves concede that neither the word "amend" nor the word "interpret" is in itself expressly inclusive of that power. In its opinion the Commission points out that no question was raised in the hearings as to the character of work performed by the employees handling the ore trains, or whether as to such work they were employees or subordinate officials, and in this view, with regard to which there is no controversy, it is clear there was no occasion or necessity for amendment or interpretation of existing orders *defining work.* And this accordingly leaves as the only matter of controversy the question whether the Copper Company or the Railroad was the actual employer (i. e., were these employees *in the*

*service of* a carrier?), and the answer to this obviously must turn upon the honesty, and hence the validity, of the twenty-year-old agreement under which they operate. The determination of this question, the Commission held, was neither expressly, as is conceded, nor impliedly, as is asserted, conferred by the applicable paragraph of the Labor Act. The Commission, however, was careful to point out that because of this, it did not follow it was without jurisdiction to determine the question in a separate proceeding brought under the Interstate Commerce Act. As to this the Commission said:

"Our jurisdiction under that act is very broad. The railroad is a carrier subject to the act. If it, in fact, operated the ore trains as a common carrier by railroad and employed the individuals engaged in the actual work on such trains, it may or may not have violated the provisions of that act as such carrier in respect of rates, regulations or practices, or with respect to the filing of schedules of its rates and charges for the transportation, in the making of reports to us, in the keeping of its records and accounts in accordance with our regulations, or in other respects. In the case of such violations, we have jurisdiction upon complaint or upon our own motion to institute an investigation. If such investigation should include in its scope operation of the ore trains over the tracks of the carrier, the status of the carrier with respect to such operation and of the persons employed in handling the trains may be determined." [1]

But the Commission properly added that it could not go into this phase of the controversy or make a finding under the Railway Labor Act, nor could it do so under the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., *where that Act was not invoked.*

This brings us then to the question whether in a proceeding based alone on the narrow and limited delegation of powers to the Commission under the Labor Act, the Commission is required or warranted in determining the validity and effect of the agreement between the Copper Company and the Railroad. While appellants urge that the power may be implied in the statutory use of the words—*"defining the work of an employee"*—their main reliance in this case is that, in the cases cited in the footnote,[2] a Division of the Commission

---

[1] Nevada N. Ry. Co. Employees, 255 I. C.C. 419, 422.

[2] Employee Under Railway Labor Act, 1928, 136 I.C.C. 321; Regulations Con-

(comprised of three of the Commission's members to whom its powers are delegated) assumed the right to answer a question more or less the same as the one here.

Referring to those cases, the Commission said that they "can hardly be regarded as consistent, considered decisions of the questions involved in this case. In fact, the questions were not sharply and fully brought to the Commission's attention until the Hudson and Manhattan Case, 245 I.C. C. 415 and Ore Dock Foremen and Laborers, 246 I.C.C. 703, in which the Commission with the questions and their consequences fully in mind and after careful consideration of the statute's provisions and their background reached the decision to which it has since adhered."

█ But although the Commission seems to us here to be over-emphasizing the distinction between its decisions and those of a Division, it does not, as we think, necessarily follow that the interpretation by the Division may be said to have received Congressional ratification. For, whether the decisions of the Divisions be regarded as "consistent, considered decisions" or not, and even though the Labor Act was amended, in respects not material here, after those decisions had appeared, the situation does not present itself as one requiring the application of the rule of statutory construction insisted on by appellants; but rather the more definite and fundamental rule that "where no ambiguity exists, there is no room for construction." [3]

"And appellants assert that the Commission in a long line of decisions has held that the rule declared in paragraph (4) applies only to traffic in possession of the carriers, and they argue that this construction was impliedly sanctioned by the inclusion of the provision without alteration in Transportation Act, 1920 * * *. But the rule that re-enactment of a statute after it has been construed by officers charged with its enforcement impliedly adopts the construction applies only when the construction is not plainly erroneous and to cases presenting the precise conditions passed on prior to the re-enactment. New York, New Haven [& H.] R. R. v. Interstate Commerce Comm'n, 200 U.S. 361, 401, 26 S.Ct. 272, 50 L.Ed. 515." [4]

And certainly the precise conditions passed on in the cases considered by Divisions 1 and 3,[5] prior to the amendments we have referred to, were markedly different from those found in the present case.

█ The language of Section 1, Fifth, of the Labor Act is plain and unambiguous. Its purpose is to authorize the Interstate Commerce Commission to define and classify the work of an "employee" or "subordinate official," apart from the work of "executives" and "officials," to the end that the status of each under the Act shall be determined by the character of his work. But there is nothing in that provision, or in any other provision of the Labor Act, clothing the Commission with jurisdiction to decide whether a particular person engaged in the character of work defined as employee work is or is not in the service of a particular carrier, or in the service of someone else; and in the circumstances shown such jurisdiction may not properly be deduced from legislative history. If it be assumed that the power given the Commission to classify employees and define work carries with it as implicit the power to decide who is the employer of a particular wage earner, it would necessarily exercise such power concurrently with the Mediation Board,[6] and possibly others,[7] which in itself might result in undesirable conflict. And this clearly was not the intent of Congress. The power to determine whether an employer is a "carrier," conceded not to be vested in the Commission under the Labor Act, and the power to determine whether a wage earner is an employee of such carrier are administrative powers of a character cognate to others given the Mediation Board and the Railroad Adjustment Board to settle employment and representa-

---

cerning Employees Under Ry. Labor Act, 1938, 229 I.C.C. 410; Id., 1938, 231 I.C. C. 91; Id., 1939, 232 I.C.C. 49.

3 United States v. Missouri Pac. R. Co., 278 U.S. 269, 277, 49 S.Ct. 133, 136, 73 L.Ed. 322; cf. Louisville & N. R. Co. v. United States, 282 U.S. 740, 757, 51 S. Ct. 297, 75 L.Ed. 672, and Norwegian Nitrogen Prod. Co. v. United States, 288 U. S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796; Pennsylvania Water & P. Co. v. Fed. Power Comm., 74 App.D.C. 351, 358, 123 F. 2d 155, 162.

4 United States v. Missouri Pac. R. Co., supra, 278 U.S., pages 279, 280, 49 S.Ct. 137, 73 L.Ed. 322.

5 See Note 2 supra.

6 See 229 I.C.C. 417.

7 Cf. Utah Copper v. Railroad Retirement Bd. and Nev. Consol. Copper Corp. v. R. R. Ret. Bd., 10 Cir., 129 F.2d 358, 363.

tion controversies, and which to exist and be exercised must be clearly delegated by Congress. Nothing in the Act is pointed out through which to justify a conclusion that such powers are implicit. The length and breadth of the Commission's power, as found in the Act, is to determine whether or not an admitted wage earner of an admitted carrier is to be classified as an employee, a subordinate official, or an official. And that is not this case. The record here shows clearly that it is not questioned that the employees in whose behalf appellants intervened perform work similar in all respects to the work of railroad employees generally, and accordingly there is nothing, as the Commission held, for it to decide.

It is regrettable that this dispute, extending over a period of nearly four years, should not have been concluded. If we had the power ourselves to remand to the Commission with instructions to hear and consider the matter in the light of its broader powers under the Interstate Commerce Act, we should think it proper so to do, in the interest of the parties and to avoid the recurrence of the question in the future, but, obviously, we have no such power, nor have we any power to require either of the parties to invoke the provisions of the Commerce Act. It does not even appear that any controversy exists which would have enabled either party to do so. We are, therefore, compelled to agree with the court below that no provision of the Labor Act furnishes a basis on which the Commission may determine either who is a carrier subject to the provisions of the Labor Act, or who in this instance is the actual employer of the employees represented by the appellant unions.

Affirmed.

ARNOLD, Associate Justice.

I concur only in the result. Plaintiff unions brought suit in the District Court alleging that there was a dispute between them, on the one hand, and a copper corporation and a railway company on the other. It involved the abstract question whether certain of their members, engaged in the local haulage of copper ore and admittedly on the payroll of the copper company, were entitled to the various rights and benefits conferred by the Railway Labor Act. Since the Railway Labor Act covers such carriers as are defined by the Interstate Commerce Act the answer to that question depends on whether this local operation nominally conducted by the copper company is in fact part of the interstate commerce operation of a railroad. Plaintiffs seek to review an order of the Interstate Commerce Commission refusing them an advisory opinion in this dispute.

There is no allegation that any right of the plaintiff unions or their members is being curtailed. Plaintiff unions seek no other relief than advice. This advice is not prerequisite to any relief which plaintiffs are now demanding from any administrative body. The case concerns only whether the Interstate Commerce Commission has jurisdiction to advise on the moot question whether the operation involved is that of an interstate carrier in order to inform plaintiffs of their future status under the Railway Labor Act.

Whether or not it would be proper for the Commission to advise plaintiffs under these circumstances cannot be determined in these proceedings. There is no case "of actual controversy" before the District Court.[1] It has, therefore, no jurisdiction.

[1] "A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. United States v. Alaska S. S. Co., 253 U.S. 113, 116, 40 S.Ct. 448, 449, 64 L.Ed. 808. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. South Spring [Hill] Gold Co. v. Amador Gold Co., 145 U.S. 300, 301, 12 S.Ct. 921, 36 L.Ed. 712; Fairchild v. Hughes, 258 U.S. 126, 129, 42 S.Ct. 274, 275, 66 L.Ed. 499; Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 487, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. See Muskrat v. United States, supra [219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246]; Texas v. Interstate Commerce Comm., 258 U.S. 158, 162, 42 S.Ct. 261, 262, 66 L.Ed. 531 * * *. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages." Aetna Life Ins. Co. v. Haworth, 1937, 300 U.S. 227, 240, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617, 108 A.L.R. 1000.

It should volunteer no opinion on the merits.

Under these circumstances it seems to me that the majority should restrain the generous impulse which moves them to rush in with an advisory opinion of their own on this moot question. No doubt their answer to the question is an interesting exercise in legislative grammar. That it is at least as plausible as a contrary conclusion would be is evidenced by the fact that the Interstate Commerce Commission split six-to-five on the question. But in the absence of a case "of actual controversy" which throws into relief the procedural consequences of obiter dicta on this close question the volunteer effort of the majority seems highly questionable. Indeed, in so far as one may now imagine the possible issues which may arise when a case comes before us, the advice of the majority leads to procedural results contrary to sensible administrative practice.

The issue which the majority attempts to decide is whether in future cases before the National Railroad Adjustment Board, the National Railway Mediation Board or the Emergency Board, these bodies or the Interstate Commerce Commission are empowered to interpret the Interstate Commerce Act. This is because the Railway Labor Act in defining the carriers whose employees are subject to its provisions adopts the definition of carriers set out in the Interstate Commerce Act. The Railway Act also defines the term "employee" as one who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission now in effect or as the same may be amended or interpreted by orders hereinafter entered by the Commission.

The majority reads these two acts together to mean that the Interstate Commerce Commission has jurisdiction to classify the work of an employee of a carrier, but no jurisdiction to determine whether or not the employer of a person so classified is actually a carrier under the Act. This is like giving a naturalist the duty of classifying butterflies and at the same time depriving him of authority to determine whether the insects before him are butterflies or not. It would compel the Commission to classify the work of everyone who shovels coal without determining whether the persons so classified were shoveling coal in an interstate railroad operation. As a grammatical proposition this is possible. As a statutory interpretation it is beyond my ability to follow.

In the majority opinion the question whether a particular individual is working for a particular interstate carrier is confused with the question whether the employer for whom an individual is admittedly working is a carrier within the purview of the Interstate Commerce Act. Common sense indicates that the latter question should be left to the Interstate Commerce Commission. It is difficult to believe that Congress intended to give the various boards set up under the Railway Act the duty of examining highly technical questions, outside their experience or function, involving the definition of carriers under the Interstate Commerce Act. It seems unreasonable to assume, in the absence of clear language which compels such a result, that the Railway Labor Board has been given an overlapping function to determine questions of a character heretofore reserved to the Interstate Commerce Commission. In interpreting an administrative act where the language clearly permits a choice of interpretations it is the function of a court to further orderly administrative procedure and prevent overlapping jurisdiction rather than to proceed as if interpretation of a procedural statute was a mere exercise in grammar.

If in the future a union appears before the District Court with an actual controversy involving the question of jurisdiction between the Interstate Commerce Commission and the Railway Mediation Board, the facts thus developed should throw light upon the proper interpretation of the scope of these jurisdictions. In the absence of such a case or controversy I indulge in these dicta only to show that this court is risking future confusion by attempting to decide the respective jurisdiction of at least four administrative tribunals in a case where there are no concrete issues before it.