**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, Plaintiff,**

v.

**NORTH CAROLINA STATE PORTS AUTHORITY, Defendant.**

Civ. No. 1462.

United States District Court,
E. D. North Carolina,
Wilmington Division.

Sept. 24, 1971.

A. A. Canoutas, Wilmington, N. C., Gleason & Miller, New York City, for plaintiff.

Robert Morgan, North Carolina Atty. Gen., Raleigh, N. C., for defendant.

## ORDER

BUTLER, Chief Judge.

This cause originally came on to be heard pursuant to an order issued to the defendants to show cause why a preliminary injunction should not issue pending the final hearing and determination of this action requiring defendant, pursuant to the Railway Labor Act, 45 U.S.C. § 152, paragraph First, to commence immediately good faith negotiations with the plaintiff to make an agreement concerning rates of pay, rules, and working conditions on behalf of those employees of the defendant for whom the plaintiff has been certified as representative by the National Mediation Board. The court has considered affidavits and legal memoranda submitted by both parties and Georgia Ports Authority as Amicus Curiae, and has heard oral argument of counsel in chambers at Clinton, North Carolina. The parties have stipulated and agreed upon the following

## STIPULATION OF FACTS

1. The North Carolina Ports Authority is an agency of the State of North Carolina, having been established pursuant to North Carolina General Statute 143-216, et seq., which was enacted by the North Carolina General Assembly in 1949.

2. The Ports Authority owns and operates two port terminals in North Carolina at Wilmington, North Carolina, and at Morehead City, North Carolina, and as an integral part of such terminals operates terminal railroads at such port sites.

3. At its port terminal in Wilmington, the Authority owns and maintains approximately six miles of track, and at its terminal in Morehead City, it owns and operates approximately three miles of track.

The terminal railroad at Wilmington was originally a part of the shipyard operation carried on at the site of World War II. Subsequently, this property was leased from the Federal Maritime Administration by the North Carolina Ports Authority under a lease-sale agreement.

The terminal railroad at both terminals is contained solely on Ports Authority property. At each terminal, there is an "interchange" with line-haul carriers. At Wilmington, the interchange is with the Seaboard Coast Line Railroad and at Morehead City, the interchange is with the Southern Railroad and the Beaufort and Morehead Railroad.

The "interchange" is the area where the Ports Authority receives rail cars from the line-haul carrier or the point where the line-haul carrier picks up rail cars, both loaded and unloaded. It is the point where the Authority's track joins with the track of the line-haul carrier.

That neither of these facilities is certified by the Interstate Commerce Commission as an interstate carrier.

No tariffs have been filed with the Interstate Commerce Commission and no tariffs are collected by the defendants for line-haul switching. However, the defendant does charge the owner or consignees of goods for the loading and unloading of boxcars and trucks.

The Ports Authority does, as a part of its operation, own warehouses on its terminals and does charge for the storage and warehousing of goods and commodities which arrive either by rail or truck from within or without the state or from ships from foreign or domestic ports.

4. All employees at the North Carolina port terminals are employed by the Ports Authority, an agency of the State of North Carolina, and receive their wages from the Ports Authority.

5. A substantial portion of all inbound freight by rail and motor carrier is unloaded by employees of the Ports Authority and likewise, a substantial portion of out-bound freight by rail and motor carrier is unloaded by employees of the Ports Authority. However, some commodities and goods are loaded directly on ships by employees of stevedore

companies who are not employees of the Ports Authority directly from a rail car to a ship. When a dock crane is used in this operation, the crane with an operator (who is an employee of the Ports Authority) is leased to the stevedore company. The operator of the dock crane is paid by the Ports Authority but is under supervision of the stevedore company.

6. Approximately 9,000 rail cars per annum are handled at both port terminals. Of all freight moving through the port terminals, approximately one-half in volume is carried by motor carrier.

In less than 1% of freight handled by rail, the line-haul carrier includes in its tariffs an amount for handling, loading and unloading services and this amount is paid by the carrier to the Authority. However, the amount paid by the railroad is not sufficient to cover the cost of handling and the remainder is paid by the owner of the freight.

7. All in-bound freight which is shipborne is unloaded by stevedore company employees (longshoremen) onto the dock and is placed in transit sheds, apron or adjacent ramp, called a "point of rest." At no point do State Port Authority employees load or unload directly from a ship. Once commodities or freight is unloaded by the stevedore company employees, it is placed by them in transit sheds, open areas or adjacent ramps. From this point on, it may be taken to a warehouse or other storage location by employees and equipment of the Authority or it may be loaded from the transit sheds, open dock areas or adjacent ramps into truck or rail cars for outbound shipment.

8. As to incoming freight unloading from railroad or truck, this is done by Ports Authority employees. Such freight may first go to warehouses and subsequently be moved by Authority employees to transit sheds, or open storage areas, or it may be moved directly to transit sheds or dock areas where it is then placed aboard ship by stevedore company employees for outbound shipment.

9. At the Wilmington terminal, there are eleven employees of the Ports Authority engaged solely in the operation of railroad equipment. These employees are classified by the Authority as Yard Conductor, Assistant Yard Conductor, Switchman-Engineer and Switchman-Engineer Trainee. At Morehead City, three such employees are engaged solely in the operation of railroad equipment.

10. As to freight which is to be exported by ship, the line-haul carrier pushes the loaded rail cars onto the track of the Ports Authority. At this point, the employees of the Ports Authority engaged in the operation of the rail equipment pick up the cars and move them cross-terminal to warehouses or transit sheds. Occasionally, the engine of the Authority goes a short distance onto the line-haul carrier's track to pick up cars but this is not customary. This is not done at the Morehead City terminal.

11. As to freight which is to be shipped from the Ports Authority, the loaded rail cars are pulled cross-terminal by Authority switch crews and pushed to the interchange track where the line-haul carrier picks them up. Occasionally, but not customarily, the engine of the Authority pushes the cars onto the track of the line-haul carrier. This is not done at Morehead City.

12. The Authority makes no charge to the line-haul carrier for the switches onto and off the interchange.

13. The three line-haul carriers are interstate carriers subject to the jurisdiction of the Interstate Commerce Commission.

14. The employees of the Authority classified as Yard Conductor, Assistant Yard Conductor, Switchman-Engineer and Switchman-Engineer Trainee do not engage in the loading and unloading of rail cars; their duties being to "spot" or locate the cars for loading and unloading.

15. Rail maintenance of trackage owned by the Authority is not done by Authority employees.

98

16. On November 15, 1968, the International Longshoremen's Association filed an application with the National Mediation Board, alleging that a dispute existed involving employees of the North Carolina State Ports Authority. Notice of such alleged dispute was acknowledged by the Attorney General of North Carolina by letter dated December 23, 1968, denying that a dispute existed or that the Authority was subject to the Railway Labor Act.

17. On June 16, 1969, the Attorney General of North Carolina received notice from the National Mediation Board as to the application of the International Longshoremen's Association.

18. That on August 5, 1969, at the offices of the National Mediation Board, a hearing was held to determine the existence of a dispute at the North Carolina Port terminals among Port Authority employees, at which time, the Attorney General of North Carolina, representing the Ports Authority, filed certain motions raising constitutional questions as to the International Longshoremen's Association and the jurisdiction of the National Mediation Board. The Attorney General also filed a motion with the Board asking that the International Longshoremen's Association be made to produce the authorization cards or other writing upon which it alleged a dispute existed at the North Carolina Ports Authority. The motion to make the International Longshoremen's Association produce the authorization cards was denied. The Board ultimately determined that it had jurisdiction and no specific disposition was made of the constitutional due process issue.

On November 4, 1969, the National Mediation Board issued its "Findings Upon Investigation" which are Exhibit A of plaintiff's complaint.

Subsequently, an election was conducted by the Board and as a result thereof, the International Longshoremen's Association was certified on February 24, 1970, as the representative as set forth in Exhibit B of the plaintiff's complaint.

And the parties having stipulated that no further evidence is required for the court to determine this action on the merits and that the court may render a final determination on the record before it, the court thereupon makes the following

## CONCLUSIONS OF LAW

1. That several issues have been raised by the pleadings. These issues include: (1) Can the National Mediation Board's determination that the railroad is a "carrier" be reviewed by this court? (2) If the determination may be reviewed, is the railroad, in fact, a "carrier" under the Railway Labor Act? (3) Does the Railway Labor Act apply to the employees in this case? (4) Did defendant receive procedural due process at the National Mediation Board hearing? (5) Is defendant a separate legal entity from the State of North Carolina or a mere alter ego of the State thus creating an Eleventh Amendment question?

2. Defendant contends that it is not a "carrier" under 45 U.S.C. § 151, paragraph First. Plaintiff contends that the defendant is a "carrier", and that the findings by the Board are not reviewable by the courts.

It is clear that the review of decisions of the National Mediation Board is quite limited. For example, the Board has exclusive jurisdiction over the certification of bargaining units and the classification of employees for the purposes of bargaining. And "the exercise of discretion by the board with respect to such matters is not subject to review by the courts." Rose v. Brotherhood of Railway and Steamship Clerks, 181 F.2d 944, 946 (4th Cir. 1950). But the non-reviewability of Board findings appears limited to those discretionary matters where its function is essentially that of a referee. Switchmen's Union of North America v. National Mediation Board, 320 U.S. 1297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), does not

require a different result. That case involved the issuance by the Board of a certificate of representation for collective bargaining. Upon a suit by an opposing union, the court held the Board's action to be non-reviewable. Cases subsequent to *Switchmen's Union* have ingrafted exceptions even to this rule. *See,* e. g., Air Line Dispatchers Assn. v. National Mediation Board, 89 U.S.App. D.C. 24, 189 F.2d 685 (1951); Aeronautical Radio, Inc. v. National Mediation Board, 255 F.Supp. 466 (D.D.C. 1966).

No cases have been cited holding that the subject matter jurisdiction of the Board is non-reviewable. Indeed, it appears that the geographical jurisdiction of the Board has specifically been held reviewable. Air Line Dispatchers Assn., *supra.* The most recent case is United States v. Feaster, 410 F.2d 1354 (5th Cir. 1969), cert. denied, 396 U.S. 962, 90 S.Ct. 427, 24 L.Ed.2d 426 (1969). In *Feaster,* the question of jurisdiction of the Board was held premature, since the suit came prior to a representation election. But dicta in *Feaster* lends support to the view that the Board's jurisdiction is reviewable. The court stated it is possible, but not certain that the Board's determination that the plaintiff Docks Department is a "carrier" may *"eventually* be a proper subject for judicial review," *Id.* at 1364, and that "while *Switchmen's Union* holds that there is no judicial review where the Board has exercised its informed discretion in resolving interunion representation disputes, *it does not preclude judicial review of questions of law which bear directly upon the jurisdiction of the Mediation Board." Id.* at 1361 (emphasis added).

Jurisdiction refers to the very power of the Board to hear a controversy. In a civil case, subject matter jurisdiction, unlike personal jurisdiction, may be raised for the first time even on appeal. Rule 12(h), Federal Rules of Civil Procedure. Defendant here has consistently objected to the Board's jurisdiction. Denial of review of the Board's jurisdiction would be the denial of a substantial right. There must be a remedy for such an alleged misinterpretation of statutory powers. "No such presumption of obliteration of rights may be entertained." Switchmen's Union of North America v. National Mediation Board, 64 S.Ct. 95, 104 (1943) (dissenting opinion).

■ 3. Once it is decided that the Board's jurisdiction may be reviewable, it becomes necessary to determine whether the Board had subject matter jurisdiction, *i. e.,* whether the defendant is a "carrier" under the Act.

"[T]he term 'carrier' includes any * * * carrier by railroad, subject to the Interstate Commerce Act * * * " 45 U.S.C. § 151. The cases make it clear that state-owned railroads are subject to the Railroad Labor Act. *See,* e. g., State of Cal. v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1043, 1 L.Ed.2d 1034 (1957). Note also that the Federal Employers' Liability Act (45 U.S.C. § 51) applies to every common carrier by railroad in interstate commerce and that the fact that the railroad is state-owned does not change this result. Parden v. Terminal Ry. of Ala., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).

Thus, if the terminal railroad in the case at bar is a carrier in interstate commerce, then the Act applies. The commerce in question is certainly interstate in nature. While cases hold that a state-owned terminal railroad *may* be a "carrier", the issues must be determined by the facts in each case. In the cases cited *supra,* the railroads were conceded to be carriers. The facts surrounding those cases justify such a conclusion. For example, in the *Taylor* case the railroad paralleled the San Francisco waterfront, served wharves and industrial plants, and connected with car ferries, docks, and three interstate railroads. It filed tariffs with the Interstate Commerce Commission and was treated by the Commission as subject to its jurisdiction. It employed between 125 to 255 persons.

In the *Parden* case the state-owned railroad owned fifty miles of track in

Mobile. It served the docks and several industries in the vicinity and operated an interchange railroad with several privately-owned railroad companies. It had contracts with railroad brotherhoods under the Railway Labor Act, maintained equipment under the Federal Safety Appliance Act, and kept records under Interstate Commerce Commission requirements. In United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567, involving the Safety Appliance Act, the State Belt Railroad served some 175 industrial plants and transported empty or loaded cars between four interstate rail carriers. It received and transported all freight cars offered to it by railroads, steamship companies, and industrial plants. It made a flat charge per car for its services. The railroad was held to be a public carrier for hire.

In the present case, defendant has a total of nine miles of track at two ports. It employs fourteen people in railroad occupations. It has never been certified by the Interstate Commerce Commission, nor have tariffs been filed with the Commission. No revenues have been generated from the operation of the railroads. They are subsidized by the state as an integral part of its overall port operations. The railroads are operated wholly within the boundaries of state-owned property. The only contacts with interstate carriers are at two interchanges. Defendant owns the engines but no rolling stock. Loading and unloading is done by stevedore company employees. Goods are carried in cars owned by the interstate carriers. The services are performed to further maritime purposes of the Ports Authority, i. e., to promote seaborne commerce at North Carolina ports.

The Ports Authority admittedly performs some railroad functions. In Ed-

wards v. Pacific Fruit Express Co., 390 U.S. 538, 88 S.Ct. 1239, 20 L.Ed.2d 112 (1968), the defendant owned, maintained, and leased refrigerator cars to railroads. It owned buildings, plants, switching tracks, and repair equipment. It was held that defendant was not a common carrier under the Federal Employers' Liability Act. The Court stated: " * * * the words 'common carrier by railroad' mean 'one who operates a railroad as a means of carrying for the public * * *'" Id., at 1240.[1] In the present case the defendant's railroads are not held out to the public as a carrier. They are not for hire.

The fact that the terminal railroads in the instant case have not been certified by the Interstate Commerce Commission and have not filed tariffs with the Commission does not prevent a finding that they are carriers. But if they are carriers, the Commission clearly has jurisdiction over them. "The Interstate Commerce Commission has jurisdiction over common carriers engaged in interstate transportation of passengers or property by railroad." 13 Am.Jur.2d Carriers § 39. And it is significant that the Commission has not attempted to exercise any jurisdiction over the defendant's railroads.

The court having decided that the determination of the National Mediation Board that the state port railroad is a "carrier" under the Railway Labor Act is reviewable and that the railroad is, in fact, not a "carrier" under the Act, it is not necessary to discuss and rule on the other issues presented to the court.

Now, therefore,

It is ordered and adjudged that the plaintiff is not entitled to the relief sought; that the action be dismissed on the merits, and that the defendant recover of the plaintiff its costs.

1. *See* also, McCrea v. Harris County Houston Ship Channel Nav. Dist., 423 F.2d 605 (5th Cir. 1970), cert. denied, 400 U.S. 927, 91 S.Ct. 189, 27 L.Ed.2d 186 (1970).