Baltimore and Ohio Railroad Co. and Western Maryland Railway Company, Appellants, *v.* Commonwealth of Pennsylvania, Department of Labor and Industry, Appellee, and United Transportation Union, Intervening Appellee.

Argued December 3, 1973, before Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. President Judge BOWMAN did not participate.

*Ross Van Denbergh,* with him *Norman R. Bradley* and, of counsel, *Saul, Ewing, Remick & Saul,* for appellants.

*Harold E. Stambaugh,* Assistant Attorney General, with him *Charles S. Solit,* General Counsel, for appellee.

*Thomas P. Shearer,* for intervening appellee.

OPINION BY JUDGE ROGERS, February 11, 1974:

United Transportation Union, a labor organization which represents the employes of Baltimore & Ohio

Railroad Co. and Western Maryland Railway Company, filed with the Department of Labor and Industry of Pennsylvania complaints alleging the failure of those railroad companies to comply with an Act of Assembly requiring such enterprises to pay its employes weekly and requesting the Department to order compliance. The Act in question is that of July 14, 1971, P. L. 221, 43 P.S. §255.1, which provides: "*Unless otherwise stipulated in the contract of hiring or in the applicable labor agreement,* every common carrier by railroad or corporation or joint stock association, operating a steam, electric, or diesel surface railroad, or engaged in the sleeping car business, or carrying on the business thereof by lease or otherwise, *shall pay once each week to each employe,* the wages earned for the seven day period ending not more than fourteen days prior to such payment. Wages as the term is herein used shall be limited to those earnings derived from basic pro rata rates of pay pursuant to a labor agreement, and shall not include incentives, bonuses, and other similar types of fringe payments." (Emphasis supplied.)

The Department appointed an examiner who conducted an evidentiary hearing to determine whether there existed contracts of hiring or labor agreements which would exempt the companies from compliance with the Act and justify the continuance by them of their practice of paying employes biweekly. The examiner found that there were labor agreements authorizing biweekly pay periods covering some but not all of the employes of each of the railroad companies. He recommended, and the Secretary approved and issued, an order that the companies pay those employes not covered by agreements weekly as the Act provides. The railroad companies have appealed.

While the appellants appear still to disagree with the Secretary's conclusion that a customary pay practice not embodied in a written labor agreement is not

an applicable labor agreement, the only question they present for our review is that of the constitutionality of the Pennsylvania Act under the Supremacy Clause,[1] the Commerce Clause[2] acting in conjunction with the Supremacy Clause, the Fourteenth Amendment of the United States and Article III, Section 32 of the Pennsylvania Constitution, which last prohibits the General Assembly, *inter alia,* from passing local or special laws regulating labor.

The appellants contend that the Act of 1971, P. L. 221, is at odds with The Railway Labor Act, 45 U.S.C.A. §151 and is therefore unenforceable. The purposes sought to be accomplished by The Railway Labor Act are the avoidance of interruption in railroad service; the protection of freedom of association among railroad employes; the assurance of independence of both railroads and their employes to organize; the provision for prompt and orderly settlement of disputes between railroads and their employes concerning rates of pay, rules or working conditions; and the prompt and orderly settlement of disputes growing out of grievances or the application of agreements concerning rates of pay, rules or working conditions. 45 U.S.C.A. §151(a). These purposes are sought to be achieved by imposing upon railroads and their employes the duties of conferring and diligently attempting to resolve their disputes amicably and by the provision of detailed procedures and elaborate machinery to assist these efforts. The National Railroad Adjustment Board is created to hear disputes not settled by conference of the parties; the National Mediation Board mediates major disputes and superintends their arbitration; and, where all else has failed, an Emergency Board appointed by the President may investigate and report on the dispute. Strike ac-

---

[1] Article VI of the United States Constitution.
[2] Article I, Section 8 of the United States Constitution.

tion and lockouts are postponed or delayed during the considerable time these mandatory statutory procedures are being exhausted and unilateral action to change existing conditions is forbidden without written notice and bargaining, if desired. Section 6, 45 U.S.C.A. §156 provides: "Sec. 6. [Notice of Intended Change in Agreements affecting Rates of Pay, Rules, or Working Conditions.] Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipts of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by Section 5 of this Act, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

The essence of the Federal legislation is that work stoppages on account of labor disputes will be best prevented if the parties themselves establish the rates of pay, rules and working conditions in the industry and settle their disputes by negotiation with the assistance of competent Federal agencies, under the influence finally of an informed public opinion. In *Detroit & Toledo Shore Line Railroad Company v. United Transportation Union,* 396 U.S. 142 (1969), the Supreme Court held that the status quo which must be maintained by Section 6 of The Federal Railway Act in-

cludes not only matters expressly dealt with in existing collective bargaining agreements but also actual conditions out of which the dispute arose, although not covered in the agreement. Justice BLACK explained the Act's purpose and methods as follows:

"The Railway Labor Act was passed in 1926 to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce. The problem of strikes was considered to be particularly acute in the area of 'major disputes,' those disputes involving the formation of collective agreements and efforts to change them. Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 722-726, 89 L. Ed. 1886, 1894, 1896, 65 S. Ct. 1282 (1945). Rather than rely upon compulsory arbitration, to which both sides were bitterly opposed, the railroad and union representatives who drafted the Act chose to leave the settlement of major disputes entirely to the processes of noncompulsory adjustment. Id., at 724, 89 L. Ed. at 1895. To this end, the Act established rather elaborate machinery for negotiation, mediation, voluntary arbitration, and conciliation. General Committee, B.L.E. v. Missouri-K.-T.R. Co., 320 U.S. 323, 328-333, 88 L. Ed. 76, 79, 82, 64 S. Ct. 146 (1943). It imposed upon the parties an obligation to make every reasonable effort to negotiate a settlement and to refrain from altering the status quo by resorting to self-help while the Act's remedies were being exhausted. Railroad Trainmen v. Terminal Co., 394 U.S. 369, 378, 22 L. Ed. 2d 344, 354, 89 S. Ct. 1109 (1969); Elgin, J. & E. R. Co. v. Burley, supra, at 721-731, 89 L. Ed. 1886 at 1893; Texas & N. O. R. Co. v. Railway Clerks, 281 U.S. 548, 565-566, 74 L. Ed. 1034, 1044, 50 S. Ct. 427 (1930). A final and crucial aspect of the Act was the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process. . . .

. . . .

"The Act's status quo requirement[s] [are] central to its design. . . .

. . . .

"The obligation of both parties during a period in which any of these status quo provisions is properly invoked is to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute.

. . . .

"It would be virtually impossible to include all working conditions in a collective-bargaining agreement. Where a condition is satisfactorily tolerable to both sides, it is often omitted from the agreement, and it has been suggested that this practice is more frequent in the railroad industry than in most others. When the union moves to bring such a previously uncovered condition within the agreement, it is absolutely essential that the status quo provisions of the Act apply to that working condition if the purpose of the Act is to be fulfilled. If the railroad is free at this stage to take advantage of the agreement's silence and resort to self-help, the union cannot be expected to hold back its own economic weapons, including the strike. *Only if both sides are equally restrained can the Act's remedies work effectively.*" (Emphasis supplied.) 396 U.S. at 148, 150, 152, 153, 155.

The parties to this litigation agree that the pay period is a working condition. We have concluded that the Act of 1971, P. L. 221, is an attempt on the part of the state to regulate this working condition in the interest of employes; that it has the effect of changing working conditions without the notice and bargaining requirements of The Railway Labor Act; that it is an interference with and an intrusion upon Federal requirements; and that it offends the Supremacy and Commerce

clauses hereinbefore cited. Although the Act of 1971 is expressly subject to the provisions of existing labor agreements, it can and in this case does change a customary working condition contrary to Section 6 of The Railway Labor Act as interpreted by *Detroit & Toledo Shore Line Railway Company v. United Transportation Union, supra.* It substitutes for customary conditions, until an agreement is reached, the heavy and immediate hand of state law for the collective bargaining process which Congress has declared to be the best and only means of changing such conditions. If we should hold that Pennsylvania may regulate customary pay periods without the agreement of the parties required by The Railway Labor Act, the state could similarly effect (and except for our supersedeas would have here effected) changes in existing practices so drastic as to render subsequent bargaining thereon pointless. Or, state regulations could be instituted during bargaining, arbitration or mediation under The Federal Railway Act so favorable to one of the parties as to render it impossible realistically for the representatives of that party to relinquish the advantage so conferred at the bargaining table although the other party is prepared for a work stoppage unless a change is made.

The Act of 1971, P. L. 221 is artful in its express subservience to hiring contracts and labor agreements and we would have more difficulty finding interference with Federal requirements had the Act expressly exempted customary practices or had the Secretary construed the Act as intending the exemption of customary practices. We do not quarrel with the Secretary's construction, for if the Act is not intended to act on customary pay periods different from the weekly requirement it stipulates, there is nothing for it to act upon, unless there is somewhere in Pennsylvania a railroad enterprise with no labor agreement. The result is that

the appellants have been ordered instantly to change a working condition other than by the procedures of The Railway Labor Act. This brings the case clearly within the rulings of *California v. Taylor*, 353 U.S. 553 (1957), holding that a state statute denying state employes collective bargaining rights was superseded as to employes of a state owned railroad by The Railway Labor Act, and *Local 24, I. B. of T. v. Oliver*, 358 U.S. 283 (1959), holding that a state antitrust law must give way to provisions of a labor agreement reached under the provisions of the National Labor Relations Act.

The case[3] and dicta from other cases relied upon by the Secretary deal with state health and safety regulations and have no application here. The distinction is fully explained and the cases analyzed by the California District Court of Appeals in *United Airlines, Inc. v. Industrial Welfare Commission*, 28 Cal. Reporter 238 (1963) where it was held that a state may not impose regulations on working conditions not related to health and safety because The Railway Labor Act has preempted the field, leaving the regulation to bargaining agreements between employes and employer. That holding and the reasoning of the opinion on which it is based are persuasive and are followed here.

In view of our holding based upon the Supremacy and Commerce clauses, it is unnecessary for us to comment upon the appellants' arguments based upon the Fourteenth Amendment and Article III, Section 32 of the Pennsylvania Constitution, beyond commenting that we have concluded that the Legislature's classification of railroad workers is reasonable and that its imposition of this regulation upon the class of railroad workers is not special legislation.

---

[3] *Terminal Railroad Association v. Brotherhood of Railroad Trainmen*, 318 U.S. 1 (1943). *See Bessemer & L.E.R.R. v. Pennsylvania P.U.C.*, 430 Pa. 339, 243 A. 2d 358 (1968).

## ORDER

AND Now, this 11th day of February, 1974, the appeal of the Baltimore and Ohio Railroad Co. and Western Maryland Railway Company is sustained and the order of the Secretary is set aside.

---

DISSENTING OPINION BY JUDGE BLATT:

I must respectfully dissent. Although I agree with the statement of the majority that "the Legislature's classification of railroad workers is reasonable and that its imposition of this regulation upon the class of railroad workers is not special legislation," I do not agree that the Act of July 14, 1971, P. L. 221, 43 P.S. §255.1 (hereinafter Act No. 43), is in conflict with and superseded by The Railway Labor Act, 45 U.S.C.A. §151 et seq.

The question of whether or not a state law is invalid as conflicting with Federal laws touching the same subject is not to be determined according to any rigid formula or rule, but depends upon whether, under the circumstances of the particular case, the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the statute in question. *Perez v. Campbell*, 402 U.S. 637 (1971); *Hines v. Davidowitz*, 312 U.S. 52 (1941). Some of the general criteria which might be applied, however, include whether or not: (1) the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it; (2) the federal statute touches a field in which the federal interest is so dominant that the federal system must be assumed to preclude enforcement of state laws on the subject; or (3) the enforcement of the state act presents a serious danger of conflict with the administration of the federal program. *Pennsylvania v. Nelson*, 350 U.S. 497 (1956).

As the majority notes, the Railway Labor Act is intended, *inter alia,* to avoid interruption in commerce or the operation of any railroad by providing for the prompt and orderly settlements of all disputes concerning rates of pay, rules or working conditions. It does not undertake governmental regulation of these matters but instead provides a means, collective bargaining, by which agreement thereon may be reached. Enactment of state laws which deal with working conditions on railroads does not result in a conflict with the Railway Labor Act, therefore, unless such state laws in some manner interfere with the procedures by which employer-employee agreements are to be reached,[1] for the Railway Labor Act was not intended to preempt the field of regulating working conditions themselves. *Terminal Railroad Association of St. Louis v. Brotherhood of Railroad Trainmen,* 318 U.S. 1 (1943).

Act No. 43 does not interfere with the expressed purposes of the Railway Labor Act and it in no way affects the means by which agreement may be reached between parties with respect to wages, hours, or working conditions. Even in situations where the statute is effective, the parties are still free to bargain over the matter of pay periods and are not compelled to reach any particular agreement thereon, and the statutory pay period can be changed or continued in effect by agreement of the parties.

Act No. 43, it seems to me, does not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the Railway Labor Act, and this interpretation is in no way

---

[1] This was the situation in *California v. Taylor,* 353 U.S. 553 (1957), wherein the state attempted to prohibit employees of a state-owned railroad from bargaining collectively because of the state policy that no state employees had the right to bargain. The Supreme Court there held that such policy was in conflict with the Railway Labor Act and thus invalid.

in conflict with the reasoning in *Detroit and Toledo Shore Line Railroad Company v. United Transportation Union*, 396 U.S. 142 (1969). That case was not concerned with retaining the status quo *per se* as applied to working conditions, but only with obliging the *parties* not to change the status quo while the procedures of the Railway Labor Act for settling disputes were being exhausted. As such, that policy retained the Act's primary objective, i.e., the prevention of strikes, an objective which will not be affected by the operation of Act No. 43.

I would affirm the order of the Department of Labor and Industry.

Judge KRAMER joins in this dissent.