461 Pa. 68 (1975)
334 A.2d 636
BALTIMORE & OHIO RAILROAD CO., and Western Maryland Railway Company,
v.
COMMONWEALTH of Pennsylvania, DEPARTMENT OF LABOR AND INDUSTRY, and United Transportation Union, Appellants.
Supreme Court of Pennsylvania.
Argued October 11, 1974.
Decided March 18, 1975.
*69 *70 *71 *72 Harold E. Stambaugh, Asst. Atty. Gen., Harrisburg, T. P. Shearer, Pittsburgh, for appellants.
Jerome H. Gerber, Handler, Gerber & Weinstock, Harrisburg, for Pennsylvania AFL-CIO, amicus curiae.
Norman R. Bradley, Ross Van Denbergh, Saul, Ewing, Remick & Saul, Philadelphia, for appellee.
Before JONES, C.J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*73 OPINION OF THE COURT
ROBERTS, Justice.
As a result of an administrative proceeding commenced by appellant United Transportation Union, appellee railroads were directed to adopt weekly pay periods for certain of their employees, as required by Pennsylvania Act No. 43 of 1971.[1] The railroads appealed this order to the Commonwealth Court, urging that the Act was invalid under the Supremacy Clause of the United States Constitution because it conflicted with the federal Railway Labor Act[2] and because it invaded a field totally occupied and therefore preempted by the Railway Labor Act.[3] They also argued that Act No. 43 discriminated against railroads without any rational basis for distinction from other businesses, in violation of the Equal Protection Clause of the Fourteenth Amendment and article III, section 32 of the Pennsylvania Constitution, P.S. The Commonwealth Court, two judges dissenting, held that Act No. 43 conflicted with the Railway Labor Act and was therefore unconstitutional.[4] We *74 granted leave to appeal in order to consider the important questions involved.[5] We reverse.
Prior to 1971, Pennsylvania law required railroads to pay their employees not less often than semi-monthly,[6] and appellees utilized bi-weekly pay periods. Despite the passage of Act No. 43, appellees continued to utilize bi-weekly pay periods[7] and appellant union filed administrative complaints with the Department of Labor and Industry, contending that, as to certain of appellees' employees, this practice was in violation of the Act. The Department held an administrative hearing and found that some of appellees' employees were covered by no "contract of hiring or . . . applicable labor agreement" providing for other than weekly payment of wages.[8] Appellees were ordered to pay "those employees. . . in accordance with [the] Act." The appeal to the Commonwealth Court ensued.
Appellees' principal contention, and the basis of the Commonwealth Court's decision, is federal preemption. Clearly, state law which directly conflicts with federal legislation is invalid under the Supremacy Clause. Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). Furthermore, even if there is no direct conflict, the state law may be invalid if it infringes where Congress has undertaken such comprehensive regulation as to evidence an intent to exclude all state legislation. Pennsylvania v. Nelson, 350 U.S. 497, *75 76 S.Ct. 477, 100 L.Ed. 640 (1956) (federal statute preempts state statute prohibiting sedition); Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (federal alien registration statute occupies the field and precludes operation of state laws on same subject); Bessemer & L.E.R.R. v. Pennsylvania Public Utilities Commission, 430 Pa. 339, 243 A.2d 358, cert. denied, 393 U.S. 959, 89 S.Ct. 395, 21 L.Ed.2d 373 (1968) (federal regulation of railroad safety preempts state regulation requiring particular methods of preventing rearend collisions). Appellees contend that Act No. 43 is defective in both respects.
The method for resolving the question of conflict is shown by Perez v. Campbell, supra:
"Deciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict."
Id. at 644, 91 S.Ct. at 1708.
The first step of this process presents no difficulty. The objectives and operation of the Railway Labor Act were summarized in Terminal Railroad Association v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571 (1943), itself a preemption case:
"The purpose of this Act is declared to be to provide `for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions'; and `for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.' It places upon carriers and employees the duty of exerting every reasonable effort to settle these disputes by agreement, and prohibits the carrier from altering agreed rates of pay, rules or working conditions except in the manner provided *76 by the agreement or by the Act itself. Machinery is set up for the adjustment, mediation, and arbitration of disputes which the parties do not succeed in settling among themselves."
Id. at 5, 63 S.Ct. at 422 (footnotes omitted).
The purpose of Act No. 43 is apparent on its face. It seeks to insure prompt payment of the wages earned by railroad employees where no provision on the timing of payment is included in an applicable collective bargaining agreement or "contract of hire."
Passing to the second step of the conflict analysis, the test to be applied is clear. Act No. 43 is invalid if it stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); Perez v. Campbell, 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971).
Clearly there is here no conflict between the purposes of the respective statutes. Compare Perez v. Campbell, supra;[9]California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957) (state law purporting to forbid collective bargaining by employees of publicly owned railroad engaged in interstate commerce held invalid). Further, Act No. 43 expressly defers to any "applicable labor agreement," so it can never "be applied to prevent the contracting parties from carrying out their agreement upon a subject matter as to which federal law directs them to bargain." Local 24, Teamsters v. Oliver, 358 U.S. 283, 295, 79 S.Ct. 297, 304, 3 L.Ed.2d 312 (1959); see California v. Taylor, supra, at 561, 77 S.Ct. at 1042 (dictum); Railway Employees Department v. *77 Hanson, 351 U.S. 225, 232, 76 S.Ct. 714, 718, 100 L.Ed. 1112 (1956) (dictum).
The manner in which appellees construct the purported conflict is more complex. The Railway Labor Act "imposes an obligation upon the parties to a railroad labor dispute to maintain the status quo while the `purposely long and drawn out' procedures of the Act are exhausted." Detroit & T.S.L.R.R. v. United Transportation Union, 396 U.S. 142, 143, 90 S.Ct. 294, 295, 24 L. Ed.2d 325 (1969) (footnote omitted). This not only requires compliance with any collective bargaining agreement between the parties, but the preservation of the "actual, objective working conditions . . . which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." Id. at 153, 90 S.Ct. at 301 (footnote omitted). At the time Act No. 43 was enacted, there was an existing dispute between appellees and the union over the union's request to adopt weekly pay periods. Consequently, appellees argue, Act No. 43 commands them to alter the status quo which they are compelled by federal law to maintain.
While plausible, this argument cannot withstand analysis. To begin with, appellees are not subject to conflicting legal obligation (to maintain and to change the status quo). Appellees would not violate the Railway Labor Act by complying with Act No. 43 because that compliance is precisely what the union seeks.
Moreover, appellees' interpretation bears little relation to "the Act's primary objective  the prevention of strikes." Id. at 154, 90 S.Ct. at 301. The Railway Labor Act does not prohibit changes in the status quo as such, but only unilateral changes by one of the parties, which would provoke retaliation by the other. As the Supreme Court said in Detroit & T.S.L.R.R. v. United Transportation Union, supra:
"If the railroad is free at this stage to take advantage of the agreement's silence and resort to self-help, the *78 union cannot be expected to hold back its own economic weapons, including the strike. Only if both sides are equally restrained can the Act's remedies work effectively."
Id. at 155, 90 S.Ct. at 302 (footnote omitted).
This danger is not present where, as here, the change is mandated by state law rather than adopted unilaterally by one of the parties. There is no provocative exercise of self-help, and before any resort is made to self-help, the procedures of the Act must be exhausted. Consequently, we conclude that there is no direct conflict between Act No. 43 and the Railway Labor Act.
The question remains whether the Railway Labor Act has undertaken such a comprehensive regulation of the field of railway labor as to evidence an intent to exclude all state legislation, without regard to conflict. See Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956); Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941); Bessemer & L.E.R.R. v. Pennsylvaia Public Utilities Commission, 430 Pa. 339, 243 A.2d 358, cert. denied, 393 U.S. 959, 89 S.Ct. 395, 21 L.Ed.2d 373 (1968). "The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field . . .." Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed. 2d 248 (1963).
Because the Railway Labor Act is clearly a comprehensive scheme of regulation, exclusive within its own province, it is crucial to ascertain the boundaries of that province. The Supreme Court has delineated the field covered by the Railway Labor Act in many cases involving preemption questions.
"`[T]he Railway Labor Act * * * does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a *79 means by which agreement may be reached with respect to them. The national interest * * * is not primarily in the working conditions as such. So far as the Act itself is concerned these conditions may be as bad as the employees will tolerate or be made as good as they can bargain for. The Act does not fix and does not authorize anyone to fix generally applicable standards for working conditions. The federal interest that is fostered is to see that disagreement about conditions does not reach the point of interfering with interstate commerce.'"
Brotherhood of Locomotive Engineers v. Baltimore & O. R.R., 372 U.S. 284, 289-90, 83 S.Ct. 691, 694, 9 L.Ed.2d 759 (1963).
The principle that the Railway Labor Act does not preclude a state from regulating the working conditions of railway employees was established in the first case to consider the preemptive effect of that Act, Terminal Railroad Association v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571 (1943). That case involved a state requirement that a railroad equip its trains with cabooses on designated routes. That requirement, like this one, was the subject of a preexisting dispute between the railroad and its employees, the existing contract calling for cabooses on some trains, but not those subject to the state order. The Court nonetheless rejected the contention that the Railway Labor Act precluded the operation of the state regulation.
Justice Jackson, writing for a unanimous Court, first observed that the procedures of the Railway Labor Act operate "to compose differences that threaten continuity of work, not to remove conditions that threaten the health or safety of workers." Id. at 6, 63 S.Ct. at 423. He continued:
"State laws have long regulated a great variety of conditions in transportation and industry, such as sanitary *80 facilities and conditions, safety devices and protection, purity of water supply, fire protection, and innumerable others. Any of these matters might, we suppose, be the subject of a demand by workmen for better protection and upon refusal might be the subject of a labor dispute which would have such effect on interstate commerce that federal agencies might be invoked to deal with some phase of it. But we would hardly be expected to hold that the price of the federal effort to protect the peace and continuity of commerce has been to strike down state sanitary codes, health regulations, factory inspections, and safety provisions for industry and transportation. . . . We hold that the enactment by Congress of the Railway Labor Act was not a preemption of the field of regulating working conditions themselves and did not preclude the State of Illinois from making the order in question."
Id. at 6-7, 63 S.Ct. at 423.
Appellees urge, however, that the power of the state to regulate working conditions is limited to matters of health and safety. In support of this proposition they cite United Air Lines, Inc. v. Industrial Welfare Commission, 211 Cal.App.2d 729, 28 Cal.Rptr. 238 (1963). That case involved a state regulation prohibiting an employer in the transportation industry from requiring an employee to contribute to the cost of purchase or maintenance of uniforms. The airline challenged the power of the state to apply this regulation to two classes of its employees: stewardesses and ticket agents. The stewardesses were covered by a collective bargaining agreement providing for a division of the cost of uniforms between employer and employee. The ticket agents were not covered by any collective bargaining agreement. As to the ticket agents, the court summarily rejected the preemption argument, holding that "the inhibitions in the Railway *81 Labor Act apply only where there is such an agreement." Id. at 749, 28 Cal.Rptr. at 249.
The key to the analysis which led the United Air Lines court to conclude that the state law was preempted as it applied to stewardesses was Local 24, Teamsters v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959). In that case, the Supreme Court held that Ohio antitrust law could not preclude the operation of a collective bargaining agreement providing for minimum rentals on owner-operated trucks. The basis for this holding was the conclusion that, in the type of case before the Court, state law could not "be applied to prevent the contracting parties from carrying out their agreement upon a subject matter as to which federal law directs them to bargain." Id. at 295, 79 S.Ct. at 304. The Court then limited its holding by noting, "We have not here a case of a collective bargaining agreement in conflict with a local health or safety regulation . . .." Id. at 297, 79 S.Ct. at 305.
Carefully read, the United Air Lines case is nothing more than a simple application of Oliver. A collective bargaining agreement existed and conflicted with the state regulation. Since the state regulation involved neither health nor safety, it could not prevail over a collective bargaining agreement having "the imprimatur of federal law." Railway Employees' Department v. Hanson, 351 U.S. 225, 232, 76 S.Ct. 714, 718, 100 L.Ed. 1112 (1956). United Air Lines is therefore inapposite to this case, for there is and can be no conflict between Act No. 43 and any "applicable labor agreement."
There is no support in the decisions of the Supreme Court for appellees' contention that, even in the absence of conflict with a collective bargaining agreement, the states are precluded from non-health related regulation of the working conditions of railroad employees. Indeed, the contrary result follows from the *82 general principles outlined above, particularly in the light of the Supreme Court's admonition that,
"[T]he principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons  either that the nature of the regulated subject matter permits no other conclusions, or that the Congress has unmistakably so ordained."
Florida Lime & Avocado Growers v. Paul, 372 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).
As the Supreme Court has noted, the purpose of the Railway Labor Act is "to compose differences that threaten continuity of work, not to remove conditions that threaten the health or safety of workers." Terminal Railroad Association v. Brotherhood of Railroad Trainmen, supra, at 6, 63 S.Ct. at 423. While the issue was not then before the Court, the reasoning applies equally well to threats to employee welfare not directly involving health or safety.
Thus, there is here no pervasive regulation of the field in which Act No. 43 operates, such as this Court found in Bessemer & L.E.R.R. v. Pennsylvania Public Utilities Commission, 430 Pa. 339, 243 A.2d 358, cert. denied, 393 U.S. 959, 89 S.Ct. 395, 21 L.Ed.2d 373 (1968) (railroad safety). Neither does Act No. 43 "`touch a field in which the federal interest is so dominant that the federal system [must] be assumed to preclude enforcement of state laws on the same subject.'" Pennsylvania v. Nelson, 350 U.S. 497, 504, 76 S.Ct. 477, 481, 100 L.Ed. 640 (1956) (sedition against federal government); see Hines v. Davidowitz, 312 U.S. 52, 62-68, 61 S.Ct. 399, 401-05, 85 L.Ed. 581 (1941) (alien registration). Finally, there is no unmistakable Congressional command to exclude state regulation of labor conditions affecting railroad employees. Consequently, we conclude that Act *83 No. 43 is not preempted. See Florida Lime & Avocado Growers v. Paul, supra.
While we have rejected the preemption reasoning on which the Commonwealth Court rested its holding, we must also consider appellees' contentions under the Equal Protection Clause of the federal Constitution and article III, section 32 of the Pennsylvania Constitution.[10] These issues may be considered together, for the content of the two provisions is not significantly different. Bargain City U.S.A. v. Dilworth, 407 Pa. 129, 131-33, 179 A.2d 439, 441-42 (1962); compare Milk Control Commission v. Battista, 413 Pa. 652, 198 A.2d 840, appeal dismissed, 379 U.S. 3, 85 S.Ct. 75, 13 L.Ed.2d 22 (1964), with Williamson v. Lee Optical, Inc., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); see also Tosto v. Pennsylvania Nursing Home Loan Agency, 460 Pa. 1, 13, 331 A.2d 198, 204 (1975).
Neither the Equal Protection Clause nor article III, section 32's prohibition of special laws forbids the state to draw distinctions. Rather, both require only that the distinctions drawn have some rational relation to a proper state purpose.[11]Tosto v. Pennsylvania Nursing Home Loan Agency, supra; Johnson v. Pennsylvania Housing Finance Agency, 453 Pa. 329, 347, 309 A.2d 528, 538 (1973); Williamson v. Lee Optical, Inc., supra; *84 Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed. 2d 349 (1972).
Appellees urge most forcefully that there is no basis for singling out railroads from the class of common carriers as the subject of this regulation. But the Legislature may have found differences in the structure of the business or labor relations environment between the railroad industry and other common carriers. In particular it might have found differences in the normal pattern of employment-related travel creating an unusual need for prompt payment of railroad workers. Alternatively, it might have concluded that in other branches of industry, either weekly payment or agreements for less frequent payment were so widespread that the statute would have no effect. Yet again it might have noted the current financial instability of railroads and concluded that this statute was necessary to minimize the exposure of railroad employees to loss in the event of the insolvency of their employer. Any of these conclusions would furnish a rational basis for Act No. 43. See McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961); Williamson v. Lee Optical Inc., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); Note, Developments in the Law  Equal Protection, 82 Harv.L. Rev. 1065, 1085 (1969).
We conclude that Act No. 43 neither denies appellees the equal protection of the laws nor is a special law prohibited by article III, section 32 of the Pennsylvania Constitution.
Order of the Commonwealth Court setting aside the order of the Secretary of Labor and Industry reversed.
POMEROY, J., filed a dissenting opinion in which JONES, C.J., joins.
*85 POMEROY, Justice (dissenting).
With respect, I am unable to agree with the Court that the subject matter of Act No. 43[1] has not been preempted by the federal Railway Labor Act.[2] In my opinion, the federal government has occupied the field covered by the Pennsylvania statute, and the latter must, under the Supremacy Clause,[3] give way.
There is no disagreement as to the general principles involved. As Mr. Justice Roberts said in speaking for this Court in Bessemer & L.E.R. Co. v. Pennsylvania Public Utility Commission, 430 Pa. 339, 243 A.2d 358 (1968) cert. denied, 393 U.S. 959, 89 S.Ct. 395, 21 L.Ed. 2d 373 (1968), reh. denied, 393 U.S. 1045, 89 S.Ct. 614, 21 L.Ed.2d 597 (1969):
"It is certainly too late in the development of constitutional law to say that Congress may not pre-empt an entire field by the passage of a broad based statute, even though the regulations passed pursuant to that statute do not in fact cover every possible situation. Moreover, once such a statute is passed, and the intention to pre-empt state law in the area becomes manifest, the various states may not pass legislation even supplemental to the federal rules, so long as the area affected by these supplemental acts coincides with the federal baliwick." (Emphasis added.) 430 Pa. at 346, 243 A.2d at 361.
The Court spoke in similar vein through Mr. Justice Cohen in Mamula v. United Steelworkers, 409 Pa. 175, 185 A.2d 595 (1962):
"Where the Congress of the United States enacts a comprehensive statute which is intended to occupy the field, the Supremacy Clause of the United States *86 Constitution requires that the state legislature and judiciary defer to the superior command of Congress. This doctrine is particularly applicable in the area of labor law which is covered in detail by numerous comprehensive federal statutes." 409 Pa. at 178, 185 A.2d 595 at 597.
The problem, of course, is to determine whether a particular Congressional enactment has occupied a particular field so completely as to indicate a clear intention to preclude state regulation. See City of Chicago v. Atchison, Topeka and Santa Fe Railway Co., 357 U.S. 77, 78 S. Ct. 1063, 2 L.Ed.2d 1174 (1958). Recognizing the perplexities that inhere in making such a determination, I am nevertheless unable to subscribe to the Court's holding that Congress has left the states free to legislate in the area of rates of pay, rules and working conditions of employees of railroads involved in interstate commerce. Under today's decision, the legislature of any state could by statute or authorized regulation prescribe a work condition for railway labor, provided only that the subject matter of the condition was not already a matter of agreement between a railroad and its employees. This cannot have been the intent of the Congress.
Guides to Congressional intent to preempt an area previously occupied by the states include the pervasiveness of the scheme of federal regulation, the dominance of the federal interest in the field, and possible inconsistency of the state policy with the objective of the federal statute.[4] *87 All three criteria point to preemption in the present case.
The large field in which this case lies is that of interstate railroad transportation. The pervasiveness of the Congressional interest in and regulation of railroads need not be elaborated upon.[5] "National rather than local control of interstate railroad transportation has long been the policy of Congress." Chicago v. Atchison, Topeka & Santa Fe Railway Co., 357 U.S. 77, 87, 78 S.Ct. 1063, 1069, 2 L.Ed.2d 1174 (1958). Turning specifically to the labor aspect of interstate railroad transportation, the relevant federal law is, of course, the Railway Labor Act. Adopted in 1926, that Act is "essentially an instrument of industry-wide government. . . . Like the Safety Appliance Act, the Railway Labor Act is `all-embracing in scope and national in its purpose, which is as capable of being obstructed by state as by individual action.' United States v. California, 297 U.S. 175, 186, 56 S.Ct. 421, 425, 80 L.Ed. 567 [573]." California v. Taylor, 353 U.S. 553, 565-566, 77 S.Ct. 1037, 1044, 1 L.Ed.2d 1034, 1042 (1957). Its purpose is "to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce. . . ." Detroit & Toledo Shore Line Railroad Company v. United Transportation Union, 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325, 331 (1969). "To this end, the Act established rather elaborate machinery for negotiation, mediation, voluntary arbitration, and conciliation. . . . It imposed upon the parties an obligation to make every reasonable effort to negotiate a settlement and to refrain from altering the status quo by resorting to self-help while the Act's remedies were being exhausted. . . . A final *88 and crucial aspect of the Act was the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process. As we noted in Brotherhood of Railway & Steamship Clerks v. Florida E.C.R. Co., 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501, 507 (1966), `the procedures of the Act are purposely long drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute.'" The Detroit & Toledo Shore Line Railroad Company v. United Transportation Union, supra, at 148-49, 90 S.Ct. at 298, 24 L.Ed.2d at 332. See also Railroad Trainmen v. Terminal Co., 394 U.S. 369, 377-380, 89 S.Ct. 1109, 22 L.Ed.2d 344, 354-55 (1969).[6]
Central to the process of dispute resolution created by the Railway Labor Act are collective bargaining relating to rates of pay, rules and working conditions, and maintenance of the status quo during negotiations and thereafter during the stages of mediation mandated by the Act.[7]Shore Line Railway Co. v. Transportation Union, *89 supra, 396 U.S. at 150, 90 S.Ct. 294, 24 L.Ed.2d at 332. There can be no doubt that a state-imposed working condition removes that condition from the scope of collective bargaining, which, as above stated, is central to the federal scheme. The bargaining freedom of at least one of the parties is thereby necessarily restricted. Adoption by states of statutes imposing such conditions also inevitably change the status quo, which under the Act is to be maintained while bargaining, and the other steps in the federal machinery, is carried out.
In California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957) the Supreme Court dealt with the applicability of the Railway Labor Act to a state-owned railroad, the Belt Railroad. Under California law the employees of the Belt Railroad, being state employees, had no right to bargain collectively with the state concerning those terms and conditions of employment which were fixed by the civil service laws of the state. The Supreme Court held that the Railway Labor Act applied to the Belt Railroad, and that the policy of the state must therefore give way. Crucial to the decision was the purpose and policy of the Railway Labor Act to protect and promote collective bargaining. "[T]he Act's policy of protecting collective bargaining comes into conflict with the rule of California law that state employees have no right to bargain collectively with the State concerning terms and conditions of employment which are fixed by *90 the State's civil service laws. This state civil service relationship is the antithesis of that established by collectively bargained contracts throughout the railroad industry." 353 U.S. at 559, 560, 77 S.Ct. at 1041, 1 L.Ed.2d at 1039. Accord, International Longshoreman's Association v. North Carolina State Ports Authority, 370 F.Supp. 33 (E.D.N.C. 1974).
There is no question that the length of a pay period is a "working condition" and subject to the provision of Sec. 6 of the Railway Labor Act. Indeed, the record shows that pay periods have been so treated for many years by the parties to this dispute.[8] That working condition  which the legislature of Pennsylvania has by Act No. 43 declared to be nonbargainable  stands in no different light than the working conditions which in California were fixed by that state's civil service laws. The same reasons which impelled the Supreme Court to hold that since the federal Act applied to the Belt Railroad the policy of California must give way, dictate that the policy of Pennsylvania as stated in Act No. 43 must also give way.[9]
*91 The Commonwealth Court, in my view, was entirely sound in its analysis of the issue here involved and in the conclusions it reached. I quote at length the following passage of Judge Rogers' opinion:
"We have concluded that the Act of 1971, P.L. 221, is an attempt on the part of the state to regulate this working condition in the interest of employes; that it has the effect of changing working conditions without the notice and bargaining requirements of The Railway Labor Act; that it is an interference with and an intrusion upon Federal requirements; and that it offends the Supremacy and Commerce clauses hereinbefore cited. Although the Act of 1971 is expressly subject to the provisions of existing labor agreements, it can and in this case does change a customary working condition contrary to Section 6 of The Railway Labor Act as interpreted by Detroit & Toledo Shore Line Railway Company v. United Transportation Union, supra. It substitutes for customary conditions, until an agreement is reached, the heavy and immediate hand of state law for the collective bargaining process which Congress has declared to be the best and only means of changing such conditions. If we should hold that Pennsylvania may regulate customary pay periods without the agreement of the parties required by The Railway Labor Act, the state could similarly effect (and except for our supersedeas would have here effected) changes in existing practices so drastic as to render subsequent bargaining thereon pointless. Or, state regulations could be instituted during bargaining arbitration or mediation under The Federal Railway Act so favorable to one of the parties as to render it impossible realistically for the representatives of that party to relinquish the advantage so conferred at the *92 bargaining table although the other party is prepared for a work stoppage unless a change is made.
"The Act of 1971, P.L. 221 is artful in its express subservience to hiring contracts and labor agreements and we would have more difficulty finding interference with Federal requirements had the Act expressly exempted customary practices or had the Secretary construed the Act as intending the exemption of customary practices. We do not quarrel with the Secretary's construction, for if the Act is not intended to act on customary pay periods different from the weekly requirement it stipulates, there is nothing for it to act upon, unless there is somewhere in Pennsylvania a railroad enterprise with no labor agreement. The result is that the appellants have been ordered instantly to change a working condition other than by the procedures of The Railway Labor Act. This brings the case clearly within the rulings of California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957), holding that a state statute denying state employes collective bargaining rights was superseded as to employes of a state owned railroad by The Railway Labor Act, and Local 24, I.B. of T. v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), holding that a state antitrust law must give way to provisions of a labor agreement reached under the provisions of the National Labor Relations Act."
Baltimore & Ohio R.R. v. Department of Labor & Industry, 12 Pa.Cmwlth. 292, at 298-300, 314 A.2d 862 at 865-66 (1974).
Because I find that the Act of 1971 is invalid under the preemption doctrine, I do not reach the questions of the constitutionality of the Act under the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States and under Article III, Section 32, of the Constitution of Pennsylvania.
*93 I would affirm the order of the Commonwealth Court setting aside the order of the Secretary of the Department of Labor and Industry.
JONES, C.J., joins in this dissent.
NOTES
[1] "Unless otherwise stipulated in the contract of hiring or in the applicable labor agreement, every common carrier by railroad or corporation or joint stock association, operating a steam, electric, or diesel surface railroad, or engaged in the sleeping car business, or carrying on the business thereof by lease or otherwise, shall pay once each week to each employee, the wages earned for the seven day period ending not more than fourteen days prior to such payment. Wages as the term is herein used shall be limited to those derived from basic pro rata rates of pay pursuant to labor agreement, and shall not include incentives, bonuses, and other similar types of fringe payments."

Act of July 14, 1971, P.L. 221, No. 43, 43 P.S. § 255.1 (Supp. 1974).
[2] 45 U.S.C. § 151 et seq. (1970).
[3] Reference was also made to the Commerce Clause, but this was clearly intended only as the source of the power exercised by Congress in enacting the Railway Labor Act. No argument is made that, absent the Railway Labor Act, the Pennsylvania statute would impose an undue burden upon interstate commerce.
[4] Baltimore & O.R.R. v. Commonwealth, 12 Pa.Cmwlth. 292, 314 A.2d 862 (1974).
[5] Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp. 1974).
[6] As in the present statute, this requirement was inapplicable if the timing of wage payments is "otherwise stipulated in the contract of hiring or in the applicable labor agreement." Act of April 24, 1913, P.L. 114, § 1 (repealed 1971). See also note 1 supra.
[7] The union represents in its brief that all other railroads in the Commonwealth voluntarily complied with Act No. 43.
[8] This finding is not contested on appeal. The employees in question are covered by a collective bargaining agreement, but it does not deal with frequency of payment.
[9] "[A] state statute that protects judgment creditors from `financially irresponsible persons' is in conflict with a federal statute that gives discharged debtors a new start `unhampered by the pressure and discouragement of preexisting debt.'"

Perez v. Campbell, 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L. Ed.2d 233 (1971).
[10] It is well settled that, even though an order is based on erroneous reasoning, this Court may affirm if the result is correct for any reason. Estate of Prynn, 455 Pa. 192, 197 n. 9, 315 A.2d 265, 267 n. 9 (1973); Concord Township Appeal, 439 Pa. 466, 469, 268 A.2d 765, 766 (1970); Ridley Township v. Pronesti, 431 Pa. 34, 37, 244 A.2d 719, 720-21 (1968); Taylor v. Churchill V.C.C., 425 Pa. 266, 228 A.2d 768 (1967); Sherwood v. Elgart, 383 Pa. 110, 117 A.2d 899 (1955).
[11] The test is more stringent if the basis of the classification is "suspect" or if it infringes upon a "fundamental right." See generally San Antonio Independent School Dist. v. Rodriguez, 411 U. S. 1, 17-44, 93 S.Ct. 1278, 1288-1302, 36 L.Ed.2d 16 (1973). No claim is made that either a "suspect classification" or a "fundamental right" is involved in this case.
[1] Act of July 14, 1971, P.L. 221, 43 P.S. § 255.1 (Supp. 1974).
[2] Act of May 20, 1926, Ch. 347, § 1, 44 Stat. 577, as amended, 45 U.S.C. § 151 et seq. (1971).
[3] Constitution of the United States, Art. 6 clause 2.
[4] The Supreme Court's statement of these indicia of congressional intent was as follows:

"The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. [citations omitted]. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. [citation omitted]. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. [citations omitted]. Or the state policy may produce a result inconsistent with the objective of the federal statute." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1947). (Emphasis added).
[5] See generally Title 45 of the United States Code and the many statutes embraced therein governing railroads in interstate commerce.
[6] The broad purposes of the Railway Labor Act as set forth by Congress in § 2 of the Act, 45 U.S.C. § 151a are as follows:

"The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C. § 151a (1971).
[7] Section 6 of the Railway Labor Act, 45 U.S.C. § 156, provides as follows:

"[Notice of Intended Change in Agreements affecting Rates of Pay, Rules, or Working Conditions.] Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipts of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 5 of this act, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."
[8] A change to a weekly pay system was proposed by means of a Section 6 notice by predecessor organizations to United Transportation Union, the present appellant, in 1959. Negotiations pursuant thereto resulted in a change from a semi-monthly basis of payments to a bi-weekly basis. This basis has continued to date.
[9] The reliance of the majority opinion, ante, page 10, on Terminal Railroad Association v. Brotherhood of Railroad Trainmen, supra, is misplaced. The Supreme Court there distinguished between "differences that threaten continuity of work" and those which involve "conditions that threaten the health or safety of workers." Id., at 6, 63 S.Ct. at 423, 87 L.Ed. at 577. The clear implication is that disputes which do not involve health or safety must be resolved through the processes of the Railway Labor Act. This reading of Terminal Railroad Association is borne out by the reference to that case in California v. Taylor, supra at 560, n. 8, 77 S.Ct. 1037, at 1041, 1 L.Ed.2d at 1039, n. 8. After citing cases upholding the supremacy of federal statutes relating to railroads in interstate commerce, the Court cites Terminal Railroad Association, for the proposition that "the Railway Labor Act did not preclude a State from establishing minimun health and safety regulations in the interests of railway employees. That case did not concern a conflict between federally protected collective bargaining and inconsistent state laws." The decision has thus been limited to the facts there involved; the unnecessarily broad language relative to preemption used by Mr. Justice Jackson in his opinion and relied on by the majority here was dictum.